IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

BARBARA ANDERSON                                          PLAINTIFF

        v.              Civil No. 05-1095

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION                                   DEFENDANT

**MEMORANDUM OPINION**

Now on this 20th day of March, 2007, comes on for review the decision of the Commissioner of the Social Security Administration ("Commissioner") denying plaintiff Barbara Anderson's application for a period of disability and for Social Security Disability Insurance benefits.   Review is conducted pursuant to **42 U.S.C. §405(g)**.

1.   The Court's role upon review of the decision of a Social Security Administrative Law Judge ("ALJ") is to determine whether the decision is supported by substantial evidence on the record as a whole.   **Ramirez v. Barnhart**, **292 F.3d 576 (8th Cir. 2002)**. Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support a conclusion. *Id*.   The Court must consider not only the evidence supporting the ALJ's decision, but also that which fairly detracts from it, and must affirm if the record -- viewed as a whole -- contains substantial evidence to support it.   *Id*.   The Court may not reverse simply because the record also contains substantial evidence that would have supported a contrary decision.   **Haley v.**

**Massanari**, **258 F.3d 742 (8th Cir. 2001).**

The burden rests on the claimant to prove that she has a disability, mental or physical, that has lasted -- or can be expected to last -- at least one year and that prevents her from engaging in any substantial gainful activity. **Pearsall v. Massanari**, **274 F.3d 1211 (8th Cir. 2001).**

2.   Following a hearing, the ALJ found that Anderson either had -- or had a diagnosis of -- hypertension, lupus, joint pain, and obesity, but did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  He found Anderson's own testimony about her symptoms, limitations, and restrictions "credible only insofar as they are supported by the medical evidence."  He further found that Anderson has the residual functional capacity to perform a full range of light work-related activities, and that such jobs exist in significant numbers in the national economy.  He concluded that Anderson was not disabled according to the Social Security Act at any time from the alleged onset date of disability -- February, 2003 -- to the date of his decision -- June 24, 2005.

3.   Anderson contends that the ALJ erred in seven ways in making his determination, to-wit:

*    failing to recognize that Anderson has lupus, and failing to consider the effects of lupus;

*    failing to recognize the impact of obesity;

-2-

* giving improper weight to the receipt of unemployment benefits;

* failing to consider her consistent employment record;

* failing to consider the effect of pain in combination with other impairments;

* improperly applying **Polaski v. Heckler**; and

* posing an improper hypothetical to the Vocational Expert.

4.  In order to evaluate Anderson's contentions, the Court has reviewed the Administrative Record, and finds that it reflects the following relevant facts:

* In December 17, 1993, Anderson complained to her doctor about shortness of breath, left-sided paralysis, and chronic swelling in left ankle and leg.

* On October 18, 1995, Anderson was treated for left shoulder pain at the Bearden Medical Clinic.

* In February, 1996, Anderson was involved in an automobile accident and injured her neck.  Her medical records following this accident reported neck problems and their treatment with a variety of muscle relaxers and pain medications.

* On May 27, 1998, Anderson saw Nurse Patti Rivers at the Bearden Medical Clinic, who noted that Anderson was "hurting in her shoulder area," and drew blood for arthritis testing.

* On June 3, 1998, Nurse Rivers reported that "[l]ab work obtained on 5-27-98 was all within normal limits."

* On June 22, 1998, Nurse Rivers noted that Anderson "had had swelling in her feet, off and on for numerous years as well as lots of musculoskeletal discomfort," and that on the May 27 arthritis panel, Anderson had "an ANA positive at 1:160 with homogenous pattern.  RA was negative.  Sed rate was 17.  We will do anti-DNA's and 1 and 2 for lupus screening today.  This definitely could be a very good indication why she has had musculoskeletal discomforts and swelling."

* On November 3, 1999, Anderson saw Dr. Abbott with a complaint of -- among other things -- headache for three to five months.

* On December 8, 1999, Dr. Abbott noted that the numbness in Anderson's arms had been related to a car accident, and was diagnosed as carpal tunnel syndrome.

* On May 19, 2000, Anderson saw Dr. Wiseman with complaints of neck pain from the back of her head down the left side of her neck and into her left shoulder for about five days.  Dr. Wiseman prescribed Flexeril[1], Lorcet Plus[2],

---

[1] Indicated "as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute painful musculoskeletal conditions."  Physicians' Desk Reference, 1995 Ed.

[2] Indicated for "the relief of moderate to moderately severe pain."  Physicians' Desk Reference, 1995 Ed.

and Motrin[3].

* On September 25, 2000, Anderson saw Dr. Wiseman for lower back pain starting three days earlier.  Dr. Wiseman prescribed Motrin and Flexeril.

* On October 3, 2000, Anderson complained to Dr. Wiseman about "intermittent back pain and neck pain," bad enough that some days "she can hardly move."  Dr. Wiseman reassured her, tried to motivate her to exercise, and continued her on Flexeril and Motrin.

* On December 19, 2000, Anderson consulted Dr. Wiseman for, among other things, bursitis pain in her right shoulder. Ultram[4] and a sling for her right arm were prescribed.

* On February 13, 2001, Dr. Wiseman noted that Anderson reported episodes of "heavy pressure sensation" and shortness of breath over the past 3-4 weeks, with numbness in her left arm.  She was referred for a stress test and cardiology consultation.

* On February 1, 2002, Dr. Wiseman noted that Anderson reported headaches about every other week, increasing in frequency, with pain rated at 10 on a scale of 1 to 10.

* On June 7, 2002, Dr. Wiseman reported that Anderson was

---

[3]Used for "minor aches and pains." <u>Physicians' Desk Reference</u>, 2007 Ed.

[4]Ultram "is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time." <u>Physicians' Desk Reference</u>, 2007 Ed.

complaining of pain in her joints, elbows, knees and hands for the last three weeks, rated as 10 on a scale of 1-10.  At that time Anderson was taking Norvasc[5], Lasix, Motrin and Flexeril.

\* On August 7, 2002, Dr. Wiseman reported that Anderson continued to have intermittent pain in her left arm and shoulder, for which she took Flexeril and Motrin.

\* Until February, 2003, Anderson worked regularly.  Her last two jobs were at a Wal-Mart store from October, 1998, to September, 2002; and at a factory, Pres-O-Lite[6], from September, 2002, until February, 2003.  At Wal-Mart she worked in the grill, running the cash register, cooking, cleaning, and stocking, standing for six hours a day and lifting about ten pounds frequently.  At Pres-O-Lite, she assembled and packed light fixtures, standing for eight hours every day, and regularly lifting 20-25 pounds.

\* On February 11, 2003, Pres-O-Lite laid Anderson off work. In a Work Activity Report completed March 18, 2003, she indicated that she had been planning to quit when she was laid off, because her feet and legs were swelling.

---

[5]Norvasc "is indicated for the treatment of hypertension."  Physicians' Desk Reference, 2007 Ed.

[6]This company is also referred to as "Prestilite," "Presc-o-Lite," and "Fresco Lite" in the Administrative Record.

-6-

* On February 14, 2003, when giving a history to her gynecologist, Anderson listed the following as "all medications" that she was taking: Norvasc, Furosamide[7], and Motrin. Her musculoskeletal system and skin were shown as "abnormal," although there is no explanation of why.

* On February 27, 2003, as part of an evaluation of the side effects of contraceptive management, Anderson reported occasional headaches, but denied leg and chest pain.

* On March 17, 2003, Anderson completed a Disability Report. She listed the following conditions as limiting her ability to work: lupus; swelling of legs, feet, hands, and face; shortness of breath; chest pain; irregular heart beat; joint pain and body soreness; face breaking out when in the sun too long; high blood pressure; and problems with the nerves in both hands and her neck. She indicated that these conditions limited her ability to pick things up, bend, stand, walk, sit, and move around. She got out of breath, and hurt all the time. She first began to be bothered by these problems in June, 1998. She listed her medications as Motrin,

---

[7] A diuretic used to treat "edema associated with congestive heart failure, cirrhosis of the liver, and renal disease. . . . particularly useful when an agent with greater diuretic potential is desired." Physicians' Desk Reference, 2007 Ed.

-7-

Furosomide, and Norvasc.

* Also on March 17, 2003, Anderson completed a Disability Supplemental Interview Outline.  She indicated that she could do laundry and dishes and change sheets sometimes, but not vacuum, sweep or take out trash.  The swelling in her hands made it difficult to grip objects, and she sometimes dropped things.  She indicated that her disability had caused her to either quit or be fired from two jobs, due to pain and swelling in her arms, hands, feet, legs and back.  She estimated her pain most of the time as 7-8 on a scale of 1-10, occurring off and on every day, mostly in her hands and arms, and sometimes in her feet, legs, back and neck.  Her medications at that time were Motrin and Extra Strength Tylenol.

* On June 26, 2003, as part of another evaluation of the side effects of contraceptive management, Anderson denied headaches, leg pain, and chest pain.

* An ANA screen on August 1, 2003, was reported as negative.

* During a cardiac consultation with Dr. Georges Chahoud, apparently on September 2, 2003, Anderson complained of joint pain and headache.

* On October 23, 2003, Anderson completed a second Disability Supplemental Interview Outline.  She stated

-8-

that she could do dishes, change sheets and take out trash, but not do laundry, vacuum, or sweep.  She needed help with driving sometimes, and had trouble with pain and swelling in her feet, legs, hands, and back.  She stated that she had pain all the time, no matter what she was doing.  Her medications at that time were Motrin, Naprosen[8], and Aleve[9].

*       On December 2, 2003, Anderson underwent a physical exam by Dr. Jerry Grant in connection with her application for Social Security benefits.  Dr. Grant noted that Anderson gave a history of lupus for five years, as well as "achiness, swelling, & occasional lumbago[10]."  He noted that she had occasional shortness of breath of unknown etiology, but denied shortness of breath upon walking.  His findings on the exam were almost all "normal," although he did note grip strength at 80% of normal and found some swelling.  It was Dr. Grant's opinion that Anderson had no limitations.

*       On January 17, 2004, Anderson completed another Disability Supplemental Interview Outline.  She stated that she could not bathe, dress, or care for her hair

---

[8]Indicated for "relief of the signs and symptoms of rheumatoid arthritis." Physicians' Desk Reference, 2007 Ed.

[9]Used to relieve "minor aches and pains."  Physicians' Desk Reference, 2007 Ed.

[10]"Pain in mid and lower back; a descriptive term not specifying cause."  PDR Medical Dictionary, 2nd Ed.

without assistance; could not wash dishes, change sheets, iron, vacuum, sweep, or take out the trash; that walking or doing housework made her out of breath and caused leg and back pain; that using her hands made her fingers cramp; and that she could not lift over 15-20 pounds. She estimated her pain at 9 to 10 on a scale of 0 to 10, and said that she hurt all the time in her legs, arms, hands, back, and neck. She listed her medications as Motrin 600, Flexeril, Norvasc, and Tylenol.

\* On March 3, 2004, the Social Security Administration denied Anderson's application for benefits.

\* On October 20, 2004, Anderson consulted Dr. Pillow at UAMS about "headache off and on." She also complained of swelling of her lower extremities, fatigue, shortness of breath, back pain, neck pain, and joint pain. Her physical exam was normal. Dr. Pillow gave her samples of Triptan for "probable migraines," and prescriptions for hydrochlorothiazide[11], atenolol[12], and Aciphex[13]. He also prescribed aspirin.

\* Included in an Inpatient History and Physical Examination at UAMS dated October 10, 2004, is the note "lupus (never

---

[11]A diuretic and antihypertensive, according to Physicians' Desk Reference, 2007 Ed.

[12]Used to treat angina pectoris and hypertension. PDR Medical Dictionary, 2nd Ed.

[13]Indicated for treatment of "erosive or ulcerative gastroesophageal reflux disease." Physicians' Desk Reference, 2007 Ed.

been treated, not followed by rheum[atologist]."

* During an office visit to the UAMS Internal Medicine Clinic on January 26, 2005, Anderson reported that she had been in a wreck in December and was concerned with nerve damage to the right side of her head. She reported dizziness and vision changes, but denied shortness of breath, chest pain, back pain, neck pain, and joint pain. Her medications at that time were aspirin, Aciphex, atenolol, and hydrochlorothiazide.

* On or about March 25, 2005, the Social Security Administration completed a Claimant's Medications form, showing that Anderson was taking Aciphex, atenolol, hydrochlorothiazide, and Flexeril, along with aspirin and Aleve.

* On April 13, 2005, Anderson saw Dr. Nelson at UAMS for leg pain with an onset of two days, not helped by Tylenol or Aleve. She also complained of fatigue, malaise, shortness of breath, diffuse joint pain, and swelling. Dr. Nelson noted that lupus was "allegedly diagnosed by Family Practice physician in 1998 (she is not sure what test and there is no data in webchart)." Dr. Nelson ordered tests for lupus. Medications at that time were hydrochlorothiazide, atenolol, Aciphex, and aspirin.

* A chart note from the UAMS Eye Clinic dated April 19,

-11-

2005, indicated that Anderson had lupus but did not
relate any eye problems to that condition, and further
indicated that she was "not on meds for lupus."

* On April 28, 2005, Dr. Nelson reported on the lupus
testing: "ESR was slightly elevated to 42. The rest of
the workup was negative, including Crithidia. I am
unable to explain this fully. Will send to Rheumatology
for further evaluation and treatment of significant
seropositive ANA, but seronegative Anti-DNA/crithidia."

* On June 24, 2005, the ALJ rendered his unfavorable
decision on Anderson's application.

* On September 29, 2005, the Appeals Council denied
Anderson's request for review of the ALJ's decision.

* On October 12, 2005, Anderson filed her Complaint seeking
judicial review of the Commissioner's decision.

5. Anderson first contends that the ALJ failed to recognize
that she has lupus, or to take that condition into account.

The contention that the ALJ failed to recognize that Anderson
has lupus is a bit wide of the mark, because the ALJ did recognize
that Anderson had carried a diagnosis of the disease since June,
1998. As for the contention that the ALJ failed to consider the
*effects* of lupus, Anderson offers nothing from which it could be
concluded that there is something about having lupus that, in and
of itself, should have resulted in a finding of disability. The

-12-

Court therefore turns to what is shown from the record about Anderson's own particular experience with the disease.  That information does not lead to a conclusion that the ALJ improperly failed to consider the effects of lupus.

To begin with, although Anderson received frequent medical care by her regular treating physicians, and saw various specialists as needed, none of her doctors ever took her off work because of lupus or any other condition.

Moreover, the nature of the condition is very vague.  "Lupus" covers a wide range of related conditions, and the particular form of lupus that Anderson claims to suffer from is not specified.  The Court has, however, addressed Anderson's allegations as though they relate to systemic lupus erythematosus ("SLE"), because this is the form that seems to most closely parallel Anderson's complaints.

SLE is defined as

an inflammatory connective tissue disease with variable features, frequently including fever, weakness and fatigability, joint pains or arthritis resembling rheumatoid arthritis, diffuse erythematous skin lesions on the face, neck, or upper extremities, with liquefaction degeneration of the basal layer and epidermal atrophy, lymphadenopathy, pleurisy or pericarditis, glomerular lesions, anemia, hyperglobulinemia, and a positive LE cell test, with serum antibodies to double-stranded DNA and other substances.

**PDR Medical Dictionary**, **2nd Ed.**

As explained in **Gude v. Sullivan**, **956 F.2d 791 (8th Cir. 1992),**

-13-

"[m]ild" SLE includes fever, arthritis, pleurisy, pericarditis, headaches, and rash, while "severe" SLE includes life-threatening diseases.  As many as ninety percent of SLE patients complain of symptoms ranging from intermittent joint pains to acute polyarthritis, and general hair loss is frequent during active phases of the disease.  The course of SLE is chronic and relapsing with long periods of remission and is totally unpredictable.

(Citing **Merck Manual of Diagnosis and Therapy**, **15th Ed., 1275-76.**)

Turning to the Administrative Record to determine whether Anderson's particular case of lupus was disabling, the Court finds that while Anderson's physicians were all aware that she had a "history" of having been diagnosed with lupus, none of them found it medically necessary to do any follow-up until April 13, 2005, when Dr. Nelson ordered tests to assess the situation.  (The equivocal results of that follow-up are not explained by any medical record before the Court.)  In addition, no doctor found it necessary to prescribe any treatment for lupus other than medications designed to alleviate mild to moderate pain.  On many doctor visits Anderson complained of no pain at all.  No doctor ever placed any restrictions on Anderson's ability to work because of lupus.  Thus the medical record does not reflect that Anderson suffered from severe or unremitting lupus, or from a level of the disease that would constitute a disabling impairment.

In addition, the Administrative Record reflects that Anderson was able to hold down a job in October, 2000, when she reported "intermittent back pain and neck pain" bad enough that some days "she can hardly move."  She was able to hold down a job in June,

-14-

2002, when she was complaining of pain in her joints, elbows, knees and hands, lasting for three weeks, that she rated as 10 on a scale of 1-10.  Thus Anderson's own conduct is evidence that her lupus was not disabling even when she found it to be extremely painful.

For all these reasons, the Court finds no error in the weight the ALJ assigned to Anderson's diagnosis of lupus.

6.   Anderson next argues that the ALJ failed to recognize the impact of her obesity on her other conditions, citing **20 C.F.R. Pt. 404, Subpt. P, App.1, §1.00(Q),** to the effect that

> [o]besity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity.  The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately.  Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

It is not accurate to say that the ALJ failed to take Anderson's obesity into account.  He specifically included obesity in his hypothetical question to the Vocational Expert.

In addition, the Administrative Record reflects that Anderson's weight changed very little over the time period here under consideration.  It is significant that Anderson was able to work -- from 1998 to 2003 -- with all of the conditions, including obesity, that she now claims are disabling.

-15-

Anderson's case is easily distinguishable from her cited authority of **Roberts v. Barnhart**, **283 F.Supp.2d 1058 (S.D. Iowa 2003)**. Roberts was about the same height as Anderson, but weighed over a hundred pounds more than Anderson. Depression and other psychological factors, from which Anderson fortunately does not suffer, contributed to Roberts' disability. Roberts' doctors opined that her obesity contributed to her pain and depression, and thus all three conditions were interrelated. The court there pointed out that none of Roberts' doctors offered "so much as a scintilla of evidence that Plaintiff is able to work."

The Court concludes that Anderson's obesity was not overlooked by the ALJ, and there is no evidence that it has the synergistic effect on her ability to work that she claims.

7. Anderson next argues that the ALJ gave improper weight to the receipt of unemployment benefits -- as evidence that she was ready, willing, and able to work -- while overlooking her consistent employment record -- as evidence that she is not a malingerer. She cites **Polaski v. Heckler**, **751 F.2d 943 (8th Cir. 1984)**(subsequent history omitted) for the proposition that "[t]he adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record."

The Court is not persuaded that the ALJ improperly weighed Anderson's receipt of unemployment benefits. Anderson herself

-16-

blurred the line between working, and being unable to work.  She at first claimed that she became disabled on June 11, 2000, but continued to work until February 1, 2003.  After being informed by her attorney at the hearing before the ALJ that working and being disabled were "two different concepts," Anderson amended her claim to allege on onset date of February 1, 2003.

In addition, the ALJ noted that Anderson had worked with her condition for a long time;  had been actively working until laid off; and showed no evidence of "a significant deterioration" of her condition since the lay-off.  He took all these factors into consideration, not just the isolated fact that Anderson was receiving unemployment benefits, in evaluating the evidentiary value of Anderson's willingness to accept those benefits.  Taken together, these factors do not place improper emphasis on the receipt of unemployment benefits.

8.   Anderson also argues that the ALJ failed to consider the effect of pain in combination with her other impairments, and improperly applied the **Heckler** factors for evaluating subjective complaints of pain, because the determination of disability must include an evaluation of the combined effects of various impairments suffered by a claimant.  **Johnson v. Secretary of HHS**, **872 F.2d 810 (8th Cir. 1989)**.  Here, however, the ALJ did consider Anderson's pain, but found that it was not as severe as she claimed, and that "the symptomatology suffered by the claimant

-17-

would not more than minimally affect her ability to carry on gainful activity at the light exertional level." Unless these findings are unsupported by substantial evidence, they justify the ALJ in not giving more weight to the effect of pain in combination with Anderson's other impairments. When the Court considers the contradictory statements made by Anderson about her pain, the fact that she worked with pain she rated as very intense, and her medication record, it cannot say these findings are unsupported by substantial evidence.

9. Anderson contends that the ALJ improperly applied the five factors found in **Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)**(prior work history; daily activities; duration, frequency and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions) when evaluating her complaints of pain. She contends that the ALJ must point out the inconsistencies in the record in order to make a credibility determination on complaints of pain, in order to demonstrate that he evaluated all the evidence. **Herbert v. Heckler, 783 F.2d 128 (8th Cir. 1986).** The ALJ found that Anderson's "testimony and allegations as to the extent of her symptoms, limitations and restrictions are considered credible only insofar as they are supported by the medical evidence." This determination was based on the following inconsistencies noted by the ALJ:

* Anderson's alleged disability was inconsistent with her prior work history, in that she "stopped working because of a business-related layoff rather than because of the allegedly disabling impairments," and had "worked for a long period of time after being diagnosed with the alleged conditions."

* Anderson's complaints were inconsistent with her daily activities, in part because she acknowledged at times the ability to do such activities as look after grandchildren, attend church, drive, mop and sweep, and in part because there was "relatively weak" medical evidence to support the degree of limitation subjectively perceived by Anderson.

* The ALJ found that Anderson's description of the duration, frequency and intensity of her pain was "not borne out by the record," but Anderson is correct that he failed to explain why. The Court does not, however, find that lack sufficient to reverse, because there is substantial evidence in the record which detracts from Anderson's testimony that she suffered pain all the time.  At the hearing, Anderson testified that she had pain just about every day, and that "the days that I don't hurt I don't even notice that I'm not hurting because I hurt 95 percent of the time." In the Court's view, this testimony effectively undermines all Anderson's other testimony about pain.  For someone who suffers from the level of pain Anderson claims, the absence of that pain could not go unnoticed.  In addition, if Anderson's pain were truly as severe

and unremitting as she claims, the Court believes her physicians would have been prescribing much stronger pain medication than was the case. While the ALJ failed to point out these inconsistencies with specificity, they exist and the Court finds it would serve no purpose to remand to allow them to be stated.

    *    Anderson's use of medications did not suggest the presence of an "impairment which is more limiting than found in this decision." As with the preceding factor, the ALJ failed to flesh out this finding, but it is clearly supported by substantial evidence in the record. Anderson's physicians treated her pain with Tylenol, Aleve, Motrin, Flexeril, and Naprosen, medications which are used to treat mild to moderate pain. The only strong pain medications she was prescribed -- Lorcet Plus and Ultram -- were prescribed in 2000, and not thereafter[14]. The fact that a claimant is not taking strong pain medication is inconsistent with a finding of disabling pain. **Haynes v. Shalala, 26 F.3d 812 (8th Cir. 1994).**

    *    The ALJ did not specifically determine that Anderson's testimony about the precipitating and aggravating factors for her pain was inconsistent with other evidence, but that was not necessary for his decision, since it appears that he accepted Anderson's testimony that her pain did not have a trigger, it "just

---

[14]Anderson testified at the hearing that her doctor had given her some samples of Ultram, but that was for migraines, which she now seldom has.

happens."  He did, however, note that "the mere fact that work activity may cause some degree of pain or other discomfort does not require the finding of disability," **Jones v. Chater**, **86 F.3d 823, 826 (8th Cir. 1996).**

      *    The ALJ found that Anderson's testimony about her functional restrictions was inconsistent with the record evidence, in that no doctor ever placed any functional restrictions on her, and Dr. Grant specifically found that she had no limitations.

      On balance, the Court finds that, while the ALJ could have more fully detailed the specifics about why he found Anderson's testimony credible only to the extent supported by the medical evidence, when considered as a whole those findings are supported by substantial evidence.

      10.  Anderson contends that the ALJ posed an improper hypothetical, basically instructing the Vocational Expert that plaintiff could perform light work.  The question is as follows:

> Assume an individual of the same age, same education, background and work experience as the claimant.  Further considering the effects of the impairment and also considering the effects of obesity and mild to moderate pain.  This individual has the ability to perform work within the full range of the light classification exertionally.  The individual would have the ability to occasionally climb, balance, stoop, bend, crouch, kneel and crawl.  Could this individual perform any of the claimant's past relevant work as you described it, as claimant actually performed the jobs or as that work is performed in the national economy?

Anderson's contention is that this hypothetical should have included the following aspects of her physical condition: obesity;

lupus, swelling of hands and feet; musculoskeletal discomfort; bursitis and rotator cuff tendonitis; shortness of breath; irregular heartbeat; joint pain; high blood pressure; bilateral carpal tunnel syndrome; small hiatal hernia; possible left lung base airspace disease; and migraine headaches.

As has been explained by Judge Melloy, then of the Northern District of Iowa,

> [a]n improper hypothetical cannot serve as substantial evidence under §405(g), and can result in a remand or reversal. A hypothetical must completely describe a plaintiff's individual impairments so that the vocational expert may accurately assess whether jobs exist for the plaintiff. The question must include only those impairments which actually exist, supported by substantial evidence, not those rejected by the ALJ. In analyzing the appropriateness of a hypothetical question, therefore, the court must determine whether the impairments excluded from the question were appropriately rejected by the ALJ.

**Cripe v. Apfel**, **21 F.Supp.2d 944, 948 (N.D. Iowa, 1998)**(internal citations omitted).

The hypothetical specifically included obesity. In addition, it included "mild to moderate pain," which on the record in this case would be the basis for any functional impairment caused by lupus, swelling of hands and feet, musculoskeletal discomfort, bursitis and rotator cuff tendonitis, joint pain, carpal tunnel syndrome, and migraine headaches. As for shortness of breath, irregular heartbeat, high blood pressure, small hiatal hernia, and possible left lung base airspace disease, there is no evidence that even Anderson herself seriously contends these are disabling

-22-

conditions, whether alone or in conjunction with her other ailments. The Court, therefore, concludes that the hypothetical was not deficient.

11. Upon consideration of all the various errors alleged by Anderson, the Court finds that substantial evidence in the Administrative Record, taken as a whole, supports the decision of the ALJ, and it will be affirmed by separate Judgment entered concurrently herewith.

**IT IS SO ORDERED.**

**   /s/ Jimm Larry Hendren**
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**